UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

RAFAEL MESSA,

        Petitioner,             <u>MEMORANDUM AND ORDER</u>

   -against-                 Civil Action No.
                                   CV-04-2724 (DGT)

D. ARTUS, Superintendent, Clinton
Correctional Facility

        Defendant.

------------------------------X

TRAGER, District Judge

    Petitioner, Rafael Messa ("petitioner"), brings this pro se

habeas corpus petition under 28 U.S.C. § 2254. Petitioner raises

the following related claims: that (1) the trial court displayed

partiality and bias in front of the jury, thereby, denying

petitioner his right to a fair trial;[1] and (2) because of the

trial court's interference, petitioner was denied the right to

confront witnesses and present his defense. For the following

---

[1] Petitioner also raises the claim that he was deprived effective
assistance of counsel by the trial court's "demeaning" treatment
of his attorney. Petitioner proposes that this argument be
viewed as a separate claim; however, it is more properly
evaluated in the context of petitioner's fair trial claim. <u>See</u>
<u>United States v. Robinson</u>, 635 F.2d 981, 984 (2d Cir. 1980)
(evaluating both the fairness and effective assistance of counsel
claims together); <u>Gumbs v. Kelly</u>, No. 97 CIV 8755, 2000 WL
1172350 at *10 (S.D.N.Y. Aug. 18, 2000) (stating that it is a
novel proposition that a judge's comments alone could deprive a
petitioner of his right to counsel and holding that such a claim
should be evaluated in conjunction with the accompanying fair
trial claim).

reasons the petition is denied.

## Background

### (1)

### The Crime

On the night of July 3, 1996 Shamsul Huq ("Huq") entered his apartment building on Woodside Avenue in Queens County, New York. Petitioner and his co-defendant, Rafael Magrigor ("Magrigor"), entered the building elevator with Huq. In the elevator the two defendants beat, threatened and robbed Huq.

When the elevator arrived at Huq's floor, petitioner and Magrigor forced Huq to open the door to his apartment where he lived with seven other family members. What followed was a scene of brutality and debauchery, during which the two assailants tied up the family members, beat them, took money and jewels, and forcibly sodomized one of them. While this was going on, another tenant of the apartment returned home. Upon seeing his family tied up, the other tenant fled to call the police.

The police arrived to find petitioner and Magrigor by the apartment window throwing items out the window. As the police entered the room, the two perpetrators threw a knife, gun and ammunition on the floor. On petitioner's person the police recovered more than $300 in cash, the victim's jewelry, and some

cocaine.

**(2)**

**The Trial**

Petitioner was charged in New York State Supreme Court with burglary in the first degree, N.Y. Penal Law ("Penal Law") § 140.30(3), five counts of robbery in the first degree, Penal Law § 160.15(3), sodomy in the first degree, Penal Law § 130.50(1), sexual abuse in the first degree, Penal Law, § 130.50(1), assault in the second degree, Penal Law § 120.05(2), criminal possession of a weapon in the second degree, Penal Law § 265.03, criminal possession of a weapon in the third degree, Penal Law § 265.02(4), and five counts of unlawful imprisonment in the first degree, Penal Law § 135.10.

Petitioner and Magrigor proceeded to trial on July 20, 1998. At trial the prosecution presented a number of witnesses including the arresting police officer, Officer Amato, the investigating detective, Detective Soto, and five of the adult victims. Through these witnesses the prosecution presented the version of the crime described above. All five victims testified with the aid of an interpreter and identified the petitioner and Magrigor as the assailants.

In response, both petitioner and Magrigor testified that on the night in question they met up for dinner, after which they

3

walked up the street to the victims' apartment to buy drugs. They both testified that they had entered the apartment only moments before the police arrived and had found the victims bound. Petitioner and Magrigor stated that they were near the window when the police entered because they were looking for the actual perpetrators who they claim left moments earlier.

Petitioner was convicted on all counts except one count of robbery in the first degree and the one count of criminal possession of a weapon in the third degree. Petitioner was sentenced as a second violent felony offender to an aggregate prison term of fifty years.

**(3)**

**The Trial Court and Attorney's Actions During the Trial**

In reviewing the trial transcript, it is clear that the trial court took an active role. In his brief, petitioner presents a number of exchanges between the trial court and petitioner's and Magrigor's attorneys. These exchanges form the basis of petitioner's claims. Rather than repeating the exchanges verbatim, the relevant exchanges will be summarized here.

The exchanges between the trial court and the attorneys began with several objections sustained <u>sua</u> <u>sponte</u>[2] during

---

[2] Frequently during the trial the court would simply say "sustained" without either the prosecution or the defense having

petitioner's opening.  During his opening, petitioner's counsel began to point out to the jury that petitioner was not charged with criminal possession of stolen property.  After the trial court sustained an objection <u>sua</u> <u>sponte</u>, counsel proceeded to state that the issue was not something that the jury had to consider, whereupon the court sustained another objection <u>sua</u> <u>sponte</u>; when counsel mentioned the issue a third time, the trial court asked "[w]hy do you keep repeating something?"  In addition to this exchange, during the opening the trial court also prevented Magrigor's counsel from mentioning grand jury testimony.  The court stated: "that's not a proper opening, mentioning what's in the grand jury."

Another set of exchanges between the trial court and the defense attorneys dealt with Huq's identification of petitioner. Most of the objections sustained <u>sua</u> <u>sponte</u> during Huq's testimony were a result of Huq's previously answering a similar question.  For instance, Magrigor's counsel asked if the assailants were wearing shoes.  When Huq answered in the affirmative, the trial court prevented counsel from inquiring about what type of shoes because the witness had answered the question.  The question appears to have been of little relevance except to test the witness's memory.

_____

first raised an objection.

5

In addition, the trial court prevented petitioner's counsel from inquiring about the racial make up of the neighborhood. Counsel asked Huq and later Detective Soto about whether a significant number of black males lived in the neighborhood. The trial court sustained objections <u>sua</u> <u>sponte</u> both times. With both witnesses, after the trial court initially said simply "sustained," counsel repeated the question more than once in different forms, forcing the court to repeatedly sustain the objection. This was a frequent tactic of both defense attorneys; when the trial court sustained an objection <u>sua</u> <u>sponte</u>, they would repeat the question, frequently multiple times, sometimes not even rephrasing it. It is worth noting that the trial court also prevented the prosecution from asking Detective Soto to characterize the type of foot traffic in the neighborhood.

Petitioner's attorney also attempted to ask Officer Amato if the area was known for drug dealing. The trial court sustained an objection <u>sua</u> <u>sponte</u> to this question. Counsel then attempted to ask the question two more times, but was cut-off by the court both times, mid-question. When counsel stated: "I didn't ask the question yet[,]" the trial court told him to "[s]tay away from that area" because it was irrelevant.

Another example of repetitious questioning after objections were sustained <u>sua</u> <u>sponte</u> came when Magrigor's attorney walked

Huq through the events of the night in question.  Huq testified

that there was some light in the room when he and the assailants

entered, but counsel then stated incredulously: "[The assailants]

knew where the switch was in the darkness and went over and

turned the light on?"  After this question, the court sustained

an objection <u>sua</u> <u>sponte</u>.  Counsel proceeded to ask five times

which lights were turned on; each time the trial court stopped

him.  Near the end of the exchange the court asked counsel

whether he wanted "to ask it once more[.]"  After counsel asked

the question again, the court stated that the question had

already been asked and again sustained an objection <u>sua</u> <u>sponte</u>.

     At one point, Magrigor's attorney asked one of the victims,

Abdul Howlander ("Howlander"), for a description of the

assailants, to which Howlander responded that one was tall and

"black."  When counsel further inquired about what he meant by

black, the court sustained an objection <u>sua</u> <u>sponte</u>.  After

counsel rephrased the question two more times, the court told

counsel: "don't keep repeating the same question after question

after I've sustained objections to it."

     In addition, the trial court sustained objections <u>sua</u> <u>sponte</u>

as to repetitive questions petitioner's counsel asked Howlander.

Petitioner's counsel questioned Howlander after Magrigor's

counsel.  Shortly before they broke for lunch, in the middle of

petitioner's counsel's cross-examination, the trial court told counsel that he was repeating questions that Magrigor's attorney "very thoroughly went over." The court warned counsel that he should not duplicate the same questions any more. After they returned from lunch, petitioner's counsel began asking Howlander about the assailant's clothing, the trial court noted that the question was asked and answered, but allowed it to be answered again. When counsel asked for more specifics about the clothing, the trial court sustained objections <u>sua</u> <u>sponte</u> to three similar questions, telling counsel that he and Magrigor's attorney had "been over this." Petitioner's counsel responded: "Not with regards to my client, Judge[,]" to which the trial court simply repeated that they had "been over this."

Petitioner's counsel later tried to get Howlander to say how long it was between when the assailants woke him and when they covered his head with a sheet. Howlander responded that he did not know exactly how long, but he thought it was between five and seven minutes later. Counsel then asked the same question several different ways, and he was stopped each time by the trial court. Following this, counsel asks Howlander how many people had entered the apartment, to which the trial court sustained an objection <u>sua</u> <u>sponte</u>. When counsel repeated the question, the trial court said that Howlander had previously testified that he

had not seen who entered the apartment. The trial court admonished counsel that the attorneys had "been over and over" the topic of who Howlander had seen entering the apartment.

In another exchange, on cross-examination of the sodomy victim, Sarifa Mino ("Mino"), petitioner's attorney asked if six black men had entered the apartment on the night in question. The trial court sustained an objection <u>sua</u> <u>sponte</u> to this question. When counsel asked the question again, Mino asked whether counsel was referring to the people in the house. The trial court then broke in and began to ask a question. When counsel said that the trial court's question was not the question counsel was asking, the court replied "[s]ustained as to your question. This is the question I am asking. Other than these two defendants, did you see anybody else in that apartment . . . except your family?" Mino responded in the negative. Counsel then proceed to asked if her testimony was that there was no one else other than two black men in the apartment. The trial court interjected to say that her testimony was that she "didn't see anybody else other than those two defendants in the apartment."

The people conducted a limited redirect of Mino. On recross-examination, petitioner's counsel started by asking: "When you talk about black men - -[.]" The trial court stopped the question and told counsel to confine his questions to what

was raised on redirect.  The trial court pointed out that "[a]ll that was [said] on redirect was that the black man was taller, Messa was taller then Magrigor."  Counsel proceeded to repeatedly ask if it was correct that two black men entered the apartment. Each time the trial court stopped him.  Counsel then asked if there was just one black man and was again stopped by the court. When counsel repeated the question of how many black men were in the apartment, the trial court noted that he had asked the question several times.  The court then repeated that counsel's questions should be limited to the fact that petitioner was taller than Magrigor.  Counsel disagreed with this categorization, saying it was the person the witness believed was petitioner.  The trial court stated that Mino had testified that the person on the right was taller, and "[t]he person on the right is Messa."

After a few more attempts at similar questions by petitioner's counsel, counsel finished his recross-examination. Magrigor's counsel then immediately proceeded to pursue a similar line of questioning with the same witness, asking: "When you say black man, what does that mean to you?"  The court stopped this recross-examination and adjourned the trial for the day.

After petitioner and Magrigor both took the stand in their defense, the people put Detective Soto on the stand as a rebuttal

witness to testify that the distance between where petitioner claimed he had dinner and Huq's apartment was approximately 2.8 miles.  During cross-examination, petitioner's counsel asked the detective if he had measured the distance only because the prosecution had asked him to measure the distance.  After the question was slightly rephrased by the trial court, the detective answered in the affirmative.  Later, Magrigor's attorney attempted to ask Detective Soto if his purpose in going to the restaurant was to measure the distance.  When the trial court stopped him by sustaining an objection <u>sua</u> <u>sponte</u>, counsel stated: "Don't mean to bore you."  Whereupon the trial court responded that petitioner's attorney had already "gone over [this material] many, many times," and the court was not going to allow the two attorneys to repeatedly cover the same material.  Counsel then said he had nothing further and added "[w]hat's there to ask?"  Upon hearing this, the trial court instructed counsel to be "very, very careful" and to not make remarks like that again.

**(4)**

### Subsequent Procedural History

On direct appeal, petitioner raised the same claims that he raises in the present action.  The New York State Appellate Division, Second Department, unanimously affirmed petitioner's conviction, holding that the trial court's evidentiary rulings

were well within its discretion and that petitioner's arguments lacked merit. <u>People v. Messa</u>, 299 A.D.2d 495, 496, 749 N.Y.S.2d 885, 885 (2d Dep't 2002). On August 25, 2003, petitioner's application for leave to appeal to the New York Court of Appeals was denied. <u>People v. Messa</u>, 100 N.Y.2d 597, 798 N.E.2d 356, 766 N.Y.S.2d 172 (2003). On July 25, 2004, petitioner timely filed the present habeas corpus petition.

## Discussion

This petition is governed by the rules set forth in the Antiterrorism and Effective Death Penalty Act of 1996. 28 U.S.C. § 2254. As such, under 28 U.S.C. § 2254(d)(1), habeas relief may only be granted if the state court's determination "was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court . . . or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

### (1)

### Petitioner's Fair Trial Claim

Petitioner's first claim is that the trial court, through its comments to the attorneys and the objections it sustained <u>sua sponte</u>, deprived him of his right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments. The

people respond that the trial court acted well within its discretion to cut off repetitious and improper questions, and that its only comments to the attorneys were a result of the attorney's own actions and did not prejudice petitioner. The Appellate Division simply held that this claim, along with petitioner's ineffective assistance claim, was "without merit," though in adjudicating his other claims the Appellate Division held that the trial court was within its "broad discretion to limit cross-examination." Messa, 299 A.D.2d at 496, 749 N.Y.S.2d at 885.

"[A] petitioner claiming that a judge's bias deprived him of a fair trial faces a difficult task." Gayle v. Scully, 779 F.2d 802, 806 (2d Cir. 1985). The task is a difficult one because in the habeas corpus context the question is whether the state trial court's actions were so severe as to entirely deny the petitioner the fundamentally fair trial guaranteed him under Due Process Clause. Daye v. Attorney General, 712 F.2d 1566, 1571 (2d Cir. 1983). "The judge's intervention in the conduct of [the] trial must be both significant and adverse to the defense 'to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceed[s] constitutional limits.'" Gayle, 779 F.2d at 806 (quoting Daye, 712 F.2d at 1572); United

States v. Pisani, 773 F.2d 397, 402 (2d Cir. 1985) ("Our role, however, is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid.").

A trial court may, and indeed at times must, intervene in a trial to maintain order and, "where necessary, to clarify testimony and assist the jury in understanding the evidence." Gayle, 779 F.2d at 806 (internal quotations omitted); Robinson v. Ricks, No. 00-CV-4526, 2004 WL 1638171 at *12 (E.D.N.Y. July 22, 2004) (stating that it is the responsibility of the trial court to "be more than a mere moderator or umpire" (internal quotations omitted)). A trial court is vested with broad discretion in performing this function. See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

Even though, at some point a trial court can go beyond its grant of discretion, Daye, 712 F.2d at 1570, Second Circuit precedent shows that federal courts will "not lightly intervene when such a claim is asserted." Gayle, 779 F.2d at 806. The Second Circuit held in Daye that even where the trial court intervened to reenforce several witnesses' identifications and aggressively questioned the defense's theory, in context these actions still did not cross the line and did not prejudice the proceedings. 712 F.2d at 1572. In another example, Johnson v.

14

Scully, 727 F.2d 222 (2d Cir. 1984), the Second Circuit said the trial court's actions were "troubling[,]" but still did not believe the trial to be unfair despite the trial court's taking over of questioning of an important prosecution witness, asking prosecution witnesses to repeat damaging testimony and seriously questioning the defendant's theory the case. Id. at 225-27.

In any evaluation of the fairness of a trial, the entire trial record must be considered and any comments viewed in the context they were made. United States v. Mickens, 926 F.2d 1323, 1327 (2d Cir. 1991); Martinez v. Kelly, No. 01 Civ. 11570, 2005 WL 1863854 at *6 (S.D.N.Y. Aug. 4, 2005). In the present matter, when viewed in context, the trial court's actions were not nearly as harmful as the trial court's actions in either Daye or Johnson and did not prejudice petitioner's trial.

The majority of interjections listed above, and most others found in the record, were prompted by the actions of the defense attorneys. Johnson, 727 F.2d at 227 (considering the attorney's actions when evaluating the prejudice created by the trial court's comments); Robinson, 635 F.2d at 985 (holding that it is important to consider a defense attorney's actions when evaluating a trial court's potential effect on the fairness of a trial). It appears that defense counsels' modus operandi was to ask the same question multiple times, even after the trial court

had sustained an objection against the question.  In addition,

counsel frequently made inappropriate comments on the trial

court's rulings.[3]

While on a number of occasions the trial court may have been

a bit too quick to sustain some objections, such as when it

sustained objections <u>sua</u> <u>sponte</u> before counsel had even finished

asking a potentially non-repetitive question, the trial court had

broad discretion to limit such questions and the court's short

fuse on some of the questioning may have been provoked by defense

counsel's conduct. On the other hand, the overwhelming majority

of his rulings were appropriate.  <u>Messa</u>, 299 A.D.2d at 496, 749

N.Y.S.2d at 885; <u>see</u> <u>Gumbs</u>, 2000 WL 1172350 at *12 (holding that

the trial court's behavior did not deprive the defendant of a

fair trial where, <u>inter</u> <u>alia</u>, the defense attorney asked

witnesses to repeat answers, ignored court directives and

discussed potentially prejudicial issues in front of the jury);

<u>Suarez v. Stinson</u>, No. 97 CIV. 3039, 1999 WL 335373 at *5

(S.D.N.Y. May 26, 1999) (deciding that the defendant still

received a fair trial, despite the trial court's numerous

comments on the repetitiveness and irrelevance of the defense

---

[3] Just one example of these inappropriate comments occurred when
the trial court sustained an objection <u>sua</u> <u>sponte</u> to a repetitive
question and Magrigor's attorney responded: "[d]on't mean to bore
you," and then stated that he had no more questions because
"[w]hat's there to ask?"

attorney's questions).

Other than counsel's own provocations, a number of the other interjections and questions asked by the trial court were designed to clarify questions or answers. The victims were not native English speakers and were testifying with the aid of a translator. This required the trial court to often interject to clarify testimony or rephrase certain questions. This appears to have been the cause of most of the exchanges cited by petitioner where the trial court appeared to refer to petitioner or his co-defendant as the perpetrators. See <u>Daye</u>, 712 F.2d at 1572 (stating that the trial court should have avoided referring to the defendant as the robber, but ultimately not holding that these comments prejudiced the jury).

In addition, the trial court instructed the jury, both during its initial charge and its final charge, that they should not consider either its rulings or its comments as evidence of petitioner's guilt or innocence. <u>Martinez</u>, 2005 WL 1863854 at *7 (noting, as a mitigating factor to the trial court's comments, that the court repeatedly instructed the jury that neither the defense attorney's behavior nor the court's exchanges with the attorney should be held against the defendant).

Furthermore, the determination that petitioner was not prejudiced by the trial court's actions is informed by the

strength of the case against him.  The police found petitioner
and Magrigor in the apartment, with a gun and in possession of
the victims' jewels.  Additionally, all five witnesses, each of
whom had ample time to observe petitioner during the robbery and
assault, identified petitioner as one of the perpetrators.  Given
this evidence, any possible damage that the trial court's actions
had was clearly harmless.  <u>See</u> <u>Robinson</u>, 635 F.2d at 986 (holding
that whatever relatively minimal effects the trial court's
comments may have had on the jury, the effects were rendered
harmless by the "overwhelming proof of the defendant's guilt").

Finally, were one to find that the trial court's conduct is
to be criticized, which it is not, there was no actual prejudice
to petitioner by the actions of the trial court.  The jury found
petitioner not guilty of one of the robbery charges and the
weapon possession charge.  This demonstrates that in its
evaluation of the evidence the jury was not influenced by the
trial court's ruling and comments.

The Second Department's determination that petitioner's fair
trial claim lacked merit, was not contrary to the Constitution,
and the petition cannot be granted on those grounds.

**(2)**

**Petitioner's Right to Present a Defense**

Petitioner's second claim is that the trial court erred in

limiting his cross-examination of several witnesses, and, thereby, "completely prevented defense counsel from presenting a defense." Pet'r's Reply Br. at 12. The State responds that petitioner was not denied the right to present a defense. The trial court's evidentiary rulings were, for the most part, entirely proper, and even if some were not, the trial court's determinations did not prevent petitioner from otherwise presenting his defense that he was not the assailant but rather was only in the apartment to buy drugs.

There is no question that a defendant has a right to confront and cross-examine the witnesses against him. Van Arsdall, 475 U.S. at 678. However, that right does not grant the defendant the ability to simply ask any question. "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant." Id. at 679. In addition, just because a trial court may have made a mistake in its rulings, it does not automatically follow that a constitutional violation occurred. "Rather, the writ [should] issue only where the petitioner can show that the error deprived him of a fundamentally fair trial. It is the

materiality of the excluded evidence to the presentation of the defense that determines whether a defendant has been deprived of a fundamentally fair trial." Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988) (quotations and alterations omitted). The question is material if it would have "'creat[ed] a reasonable doubt that did not otherwise exist.'" Id. (quoting United States v. Agurs, 427 U.S. 97, 112-13 (1976)). This means that the precluded evidence must be reviewed in the context of the entire record. Id.

In the instant matter, the Appellate Division held that the trial court was well within its "broad discretion to limit cross-examination when questions [were] repetitive, irrelevant or only marginally relevant, concerned collateral issues, or threatened to mislead the jury." Messa, 299 A.D.2d at 496, 749 N.Y.S.2d at 885. On review of the transcript, this determination cannot be said to have been contrary to or an unreasonable application of the Supreme Court standard mentioned above.

Petitioner initially claims that he should have been allowed to question Officer Amato about whether the neighborhood was known for drug transactions. The trial court had been consistent through out the trial, with both the prosecution and the defense, in restricting questions about the general makeup or character of the neighborhood. Such questions were irrelevant because this

crime did not happen on the street.  This determination was not
beyond its discretion.  Moreover, even if petitioner was allowed
to ask the question, there is no indication that this would have
created reasonable doubt that did not already exist.  Both
petitioner and Magrigor testified that they went to the apartment
to buy drugs.  Additionally, Officer Amato testified that drugs
had been recovered on Messa.  Finally, the defense attorneys both
argued in their openings and closings that the defendants' sole
motivation in going to the apartment was to buy drugs.

Next, petitioner claims that the trial court should not have
sustained several objections <u>sua</u> <u>sponte</u> concerning questions to
the victims about petitioner's clothing and appearance.  However,
in the majority of the situations, the questions were either
repetitive or only marginally relevant.  Although the
identifications were hardly subject to attack, as the crime took
place over the course of more than an hour, the defense attorneys
were still permitted to spend significant time questioning each
of the eyewitnesses about their descriptions of the assailants.
As a result, petitioner had ample opportunity to cross-examine
and question the witnesses' identifications.  The limitations on
the cross-examinations were well within the trial court's
discretion.

Finally, as noted, the People's case against petitioner was

very strong, and it relied on more than just a single witness's identification.  Therefore, if petitioner had been allowed to ask these questions, the answers would not have created reasonable doubt in light of the other evidence presented.  See Benn v. Greiner, 402 F.3d 100, 106 (2d Cir. 2005) (holding in a rape case that evidence of the victim's prior false sexual assault claim did not raise reasonable doubt when viewed in the context of the strong case against the defendant, which involved multiple eyewitnesses).

Based on this, the Appellate Division's determination is in line with the Supreme Court's precedent, and the writ cannot be granted on these grounds.

## Conclusion

For the foregoing reasons, the petition is denied. As petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. The Clerk of the Court is directed to close this case.

Dated: Brooklyn, New York
       November 20, 2006

                          SO ORDERED:


                          _____/s/_____
                          David G. Trager
                          United States District Judge